# EXHIBIT "K"

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: BERGEN COUNTY
DOCKET NO. BER-L-3719-02

AVIATION INVESTORS INTERNATIONAL GROUP, LTD., a Cayman Islands Corporation, AVIATION INVESTORS HOLDINGS, LTD., a Cayman Islands Corporation, AII DC-10-30-46922, INC., a Delaware Corporation, AVIATION INVESTORS DC-10-30-981, LTD., a Cayman Islands Corporation, and AII DC-10-30-46991, INC., a Delaware Corporation, and AVIATION INVESTORS 757-24838, LTD., a Cayman Islands Corporation,

Plaintiffs,

vs.

CARL SIMONI, REDWOOD INVESTMENT CORP., a New Jersey Corporation, OMNI ENTERPRISES, INC., a New Jersey Corporation, COMJET AVIATION MANAGEMENT, LLC, a Delaware Limited Liability Company, MAXIME SADOWSKY, AIS, LTD., a Cayman Islands Corporation, CHARLES EDWARD KESSLER, CPA, and FLEET NATIONAL BANK, a national banking association,

Defendants.

VOL. II
DEPOSITION OF:
ALBERTO LENSI

had any conversations with Jerry Rosen in that issue?

A. In which time?

Q. At any time.

MR. KOHANE: Well, so far he's asked you a yes or no --

A. If I spoken to Jerry Rosen, yes, probably during this litigation, after the arbitration definitely.

Q. After the arbitration?

A. After the arbitration, when the lawsuit came out.

Q. Is that what you talked about earlier where you told Jerry the reasons that you were dissatisfied or the reasons for terminating the Comjet, are you talking about that conversation?

A. I cannot remember the conversation to say Simoni has been terminated. You'd be willing eventually to manage. That was probably the deal.

Q. Did Rosen ever say anything to you about the buyout issue?

MR. KOHANE: Just yes or no right now.

A. It's difficult to remember now. It's during the time after -- after -- during litigation, after arbitration. We spoke about it during those last few years.

Q. During the last few years you've had conversations?

A. Yes, during the litigation after the arbitration, yes.

Q. Has Mr. Rosen, at any time, ever told you whether he believed that the buyout had been paid or not?

MR. KOHANE: Hold on. As phrased, I object to the question. I'll have to consult with him about whether it would result in a disclosure of confidentiality. Let me talk to you.

MR. DERMAN: You know what? To make it easier, I'm going to ask him -- put this on the record. I'm going to ask him -- the last few questions I have is ask him about Jerry, whether you talked to Jerry about the buyout, the alleged miscalculation and the allegations of excessive usurping corporate opportunities.

What I want to know is whether Jeffrey ever told him any information about those things and took a position on those issues. That's the line of questioning that I left out that I was going to ask him, so you want to talk to him, take a few minutes.

You know what it is? It's the allegations in this case. I want to ask about

whether he's talked to Jerry about it, whether Jerry has told him his view on it. Jerry was with company.

A. Tell me which time.

Q. I want to ask you at any time, at any time?

MR. KOHANE: The question, as phrased, I believe, impacts -- seeks information that may -- some information that may be protected and some information that may not be protected.

I've instructed the witness to give an answer with respect to any information not protected by the privilege.

MR. DERMAN: Just so I have some idea, can you define the scope of what would be protected? Does it relate to because it was conversations with Rosen during a certain time, because there was a lawyer involved? Can you be more specific?

MR. KOHANE: I tried -- yes, I'll try to do it again. If you were asking specifically about conversations that happened while Rosen was working for Comjet, I think, generally speaking, those are not privileged.

I hesitate only because just prior to the arbitration, there may have been some joint defense issues, but I don't think that will -- the

response on that, I don't believe, will reveal any privileged conversations anyway, so thereafter, once litigation began between your client and ours --

MR. DERMAN: And Jerry began assisting your client.

MR. KOHANE: And Jerry began assisting our client, as I understand what you want to ask him, it concerns Rosen's communications with him about whether Rosen had views about litigation strategy and claims, and I --

MR. DERMAN: Actually, I'm not asking for --

MR. KOHANE: You didn't use the word "strategy."

MR. DERMAN: I want to know facts, if Jerry has told him, for example, you know, yes, I believe the buyout was calculated wrong or, you know, or Karen Meyers told me the buyout was calculated right or, you know, facts that were communicated to him, conversations he's had with Jerry about the buyout or about the other issues in the case.

MR. KOHANE: Well, not the way you phrased it before.

A. Let's go one by one.

Q. So the first question is, did you have

365

conversations with -- or what was the substance of conversations with Jerry about the issue of whether Carl received his buyout payment?

MR. KOHANE: You're not going to break it down by time?

Q. We'll break it down.

Before Jerry began assisting you with the litigation?

A. The first time that they start to talk with Jeffrey about the situation was after the arbitration and when he became a manager of the aviation company.

Q. Okay.

A. I asked him questions about -- as a manager, about past things about the Aviation. Of course, I asked normal things.

Q. What did Jerry say about the issue of the buyout?

MR. KOHANE: Only if you're specifically talking about numbers, I don't think I have a problem with it, but if you're talking about potential claims or anything of that nature, or if it was, for example, to assist us in litigating the issues, I believe both as his -- as I guess he was providing legal services, and as I said, because it's a joint

366

defense agreement and because he was acting as agent for the company in communications with counsel, I believe those to be privileged.

Q. Prior to Jerry assisting you with the litigation, what did Jerry tell you -- did Jerry tell you whether he believed Carl received the buyout payment?

A. Yes, we had some conversation after the arbitration, yes. I believe -- he believed he was paid.

Q. Jerry told you that?

A. He believed he was paid.

Q. Yes?

A. Yes.

Q. And that was sometime after the arbitration, but before he began assisting you with the litigation?

A. No. I talked to him when I became -- when K&J Aviation start to manage their plane.

MR. KOHANE: Then I have to move to strike it. We'll deal with that. I move to strike it on privileged grounds.

MR. DERMAN: Except I don't think that's the same time. I don't think he started doing legal services at the same time he started managing the

367

aircraft.

MR. KOHANE: I thought it was roughly at the same time. Rosen will tell you. I thought it was.

Q. And what -- well, my next question was, what did he say specifically?

MR. KOHANE: About what?

MR. DERMAN: About --

MR. KOHANE: About whether --

MR. DERMAN: Carl had gotten paid.

MR. KOHANE: I'm going to have to instruct you not to answer that.

Q. Let's move on to the next question.

Did you have any conversations at any time with Mr. Rosen about whether the buyout was calculated properly?

MR. KOHANE: Same instruction.

Q. So try and break it down by before Jerry started conducting some litigation assistance.

A. Look, after the arbitration, Jerry became, with K&J, the manager of the aviation company -- group, so I talked to him about those things. We talk about the arbitration and we talk about many things. Of course, we talk about -- of course, he knew he was paid.

368

Q. Now, I'm talking about whether the calculation was done properly.

A. I talk with him about, you know, on the arbitration -- on the arbitration, the issue raised about whether it was correctly or not correctly calculated with omission of liabilities, and Jerry was aware about that.

Q. Did he agree with that?

MR. KOHANE: Objection. Don't divulge the substance of the conversation.

Q. Okay. Did you ever talk to Jerry about the issue of whether Carl received excessive compensation as not through Comjet, but through his role in the aviation companies?

MR. KOHANE: Same instruction. In other words, if it's before the time he started consulting with you on litigation --

A. No, I don't think we talked about -- this was not an issue. The issue was different. It was Comjet instead of Aviation.

Q. How about Comjet, did you ever talk to Jerry about whether Comjet, you know, whether the payments to Comjet were excessive?

MR. KOHANE: Yes or no for now.

A. It's difficult to say when he was legal

369

advisor, when he was not -- I talked to him many times about the situation. I cannot tell if he was already legal advisor or not.

Q. One of the things we talked about earlier about the Comjet management fees was you said you had an understanding -- even though it didn't say it in the agreement, you had an understanding that the fees -- that 75 percent of those fees would be given to the company. Is that correct?

A. That was my understanding. I was sure in my mind was no mistake when he said the same deal is the same deal. He had the 25 percent before, he had the 25 percent now.

MR. KOHANE: He is Simoni there?

THE WITNESS: Simoni.

Q. Isn't it an understanding that you had that understanding?

A. It was an agreement, for me was an agreement.

Q. For you it was an agreement?

A. Yes.

Q. Not a writing anywhere?

A. I explained longer before, long speech.

Q. The question is if it's in writing anywhere?

370

MR. KOHANE: That was asked and answered.

A. No. We have agreements. Agreements say what the agreements say. They were prepared definitely by Simoni office. I agree something to pay Comjet the same management Redwood was getting before, Simoni was getting before. For me was so clear was on -- only 25 percent, not even that. What's -- no reason to write something was so clear.

Q. Did you ever have any conversations with Jerry Rosen about that understanding?

A. At the time, definitely not.

Q. No.

And how about since --

A. During the litigation, probably, yes. During the litigation, so basically --

Q. Actually, you testified earlier that you did have a conversation with Jerry, that Jerry was present three to five months later when you confronted Simoni about -- did I misunderstand you?

MR. KOHANE: I got the wrong time frame.

A. No. When I come back three, four months -- I forget where I was. Jerry was in the room. I asked a specific question about where is the money for Aviation and Black Bird and was real very,

371

very bad vibe in the room at the time, and Jerry left the room and I don't know why, but I think -- I don't know. He left the room.

Q. When you asked the question, Jerry picked up and left the room?

A. I remember he left the room. Maybe Simoni asked him to go. I was there with Simoni. Jerry was there in and out, as I said, in and out.

Q. Simoni didn't lie to you in that conversation, did he?

A. Which conversation?

Q. The one where you asked him -- where you told him or you confronted him with the fact that Comjet was receiving all the management fees.

A. His answer was -- Simoni say all the money is for Comjet, there's no money for Aviation.

Q. So --

A. Simoni say all the money is for Comjet, is not for Aviation.

Q. He told you the truth?

A. He told me the truth that something was done for fraudulently, so what is the truth, what truth is.

Q. He didn't try and hide it from you at that time?

372

A. He said the money -- hey, I realize he got me, right, he got me. He trick me. I say before. So he say the money was going to Comjet. I told you before. The only reason why I make an agreement for the money go to Comjet direct from the bank was for convenience only. That's it.

Q. At that meeting, he told you the truth? He didn't try and hide the fact that all the money was going to Comjet, did he?

A. He got all the money. He got the money and never give the money back.

Q. Can you answer the question?

A. He said the truth, yes, the money was staying in Comjet.

Q. Okay. And I may have asked this before. I just don't know if I got an answer.

Did Mr. Rosen ever express to you that he had the same understanding that you had that Comjet was supposed to only take 25 percent of the money?

A. Look, at the time, I remember it was very, very bad vibe in the room. I don't think he told me at the time. Of course, during this litigation, those things did come out.

Q. Okay. The next question is going to be,

since he's helped you in the litigation, has he told you what his understanding was -- you're going to instruct him not to answer that?

MR. KOHANE: Correct.

MR. DERMAN: All right. That's all the questions I have.

THE WITNESS: Done? Wait, I'm not done.

CROSS-EXAMINATION BY MR. KOHANE:

Q. I'm not going to say I only have one.

Mr. Derman asked you a question about why you think Comjet and/or Simoni have Aviation documents.

Are there any other reasons other than the ones you expressed earlier about why you think that?

A. Yes.

Q. What is that?

A. I have one meeting conversation with Kessler and Jerry Rosen and Kharver Ali, and at this meeting, Kessler told me that he gave all the financial records to Simoni, but that his practice as a CPA, always keep a copy at his office.

Q. Is that the same meeting that you testified to before, it may have been yesterday with Kessler?

A. This was the only meeting I had with Kessler.

MR. KOHANE: Okay. That's it.

REDIRECT EXAMINATION BY MR. DERMAN:

Q. Just one follow-up.

Did you discuss that issue with your lawyer at the break, the issue that you just talked about now?

A. With Meisel.

Q. Right now, with Mr. Kohane, did you talk about that issue?

A. Which issue?

Q. What you just talked about, about recalling that there was another way that you knew that you were missing documents.

A. He asked me -- he told me since yesterday he wanted to ask a question after your questioning.

MR. DERMAN: Okay. That's all the questions I have.

(Whereupon, the deposition of ALBERTO LENSI is concluded at 5:17 p.m.)

CERTIFICATE

I, ELLEN M. HAMER, LICENSE NO. X101618, a Notary Public and Certified Shorthand Reporter of the State of New Jersey, do hereby certify that prior to the commencement of the examination, ALBERTO LENSI was duly sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

ELLEN M. HAMER
Notary Public of the
State of New Jersey
My commission expires 3/1/2006
DATED: 12/2/03

**EXHIBIT "L"**



A PROFESSIONAL CORPORATION

COUNSELLORS AT LAW
COURT PLAZA NORTH
25 MAIN STREET
P.O. BOX 800
HACKENSACK, NEW JERSEY 07602-0800
(201) 489-3000
FAX (201) 489-1536
www.coleschotz.com

TELECOMMUNICATION DEVICE FOR THE DEAF
(201) 489-3479

767 THIRD AVENUE
NEW YORK, NEW YORK 10017
(212) 752-0110
FAX (212) 751-8238

MORRILL J. COLE*
EDWARD M. SCHOTZ
MICHAEL S. MEISEL*
MICHAEL R. FORMAN
STANLEY STERN▲
THOMAS J. LA CONTE
HARVEY A. MILLER
HENRY M. MATRI
GERALD H. GLINE
HAROLD N. TOLCHINSKY▲
STEVEN R. KLEIN
MARC R. BERMAN
WENDY M. BERGER▲
SAMUEL WEINER
RICHARD W. ABRAMSON
MICHAEL R. LEIGHTON▲
STEVEN D. LEIPZIG▲
GORDON C. DUUS
STUART KOMROWER▲
GLENN R. KAZLOW
MICHAEL D. SIROTA▲
ALAN RUBIN▲
STEVEN I. ADLER
MICHAEL E. JONES
DONALD A. OTTAUNICK▲

*Certified Civil Trial Attorney

REBECCA K. SPAR▲
LEO V. LEYVA▲
DAVID M. KOHANE▲
JAN ALAN LEWIS▲
JEFFREY H. SCHECHTER▲
ILANA VOLKOV▲
W. JOHN PARK▲
MITCHELL W. ABRAHAMS
MARC P. PRESS▲
EDWARD S. KIEL
KENNETH L. BAUM▲
STEVEN L. KLEPPER▲
LORI I. WOLF▲
GARY M. ALBRECHT▲
WARREN A. USATINE
RANDI W. KOCHMAN▲
IRYNA LOMAGA CAREY▲
GARY A. PHILLIPS
JORDAN A. FISCH
MICHAEL A. CHAGARES
BARRY M. SCHWARTZ▲
JAMIE P. CLARE
WENDY F. KLEIN▲
CATHERINE E. BOSTOCK▲

CARL A. RIZZO
GERARD M. GIORDANO
SPECIAL COUNSEL

ROBERT J. SCERBO
SHARON REIDER BABB▲
MICHAEL A. MINERI▲
JEFFREY M. TRAURIG▲
LUIS J. AMARO, JR. ▲
MICHAEL N. MORCA▲
ROBERT K. ROSS▲
HELEN J. CHANG
SUSAN M. USATINE
JAMES T. KIM
CARMEN ANDRADE▲
SEAN M. LIPSKY▲
DAVID P. STEINBERGER
MARK J. POLITAN▲
KELLY A. KULAK▲
CHRISTOPHER J. CASLIN▲
JOSEPH BARBIERE▲
DOUGLAS J. EILENDER▲
MICHAEL S. CANARICK▲

DAMIAN L. ALBERGO▲
LEANNE M. SNYDER▲
JASON R. MELZER▲
ALLISON R. LANGE
JILL A. STEINBERG▲
DAVID T. SHIVAS▲
AMY C. BUCK▲
KRISTIN S. ELLIOTT▲
MATTHEW R. KAPLAN▲
MARY R. WAMPLER▲
ANTONIO G. CAMMALLERI
MATTHEW E. FERNANDO▲
GIA G. INCARDONE
DOROTHY MELLO LAGUZZA▲
CHRISTOPHER R. MASSARO
SCOTT M. BROWN
ANDREW B. FISHER
MICHELE L. MATHERS

▲ NJ & NY BARS
◆ NJ & PA BARS
□ NJ & FL BARS
● NY BAR ONLY

REPLY TO HACKENSACK OFFICE

WRITER'S DIRECT LINE
(201) 525-6267

WRITER'S DIRECT FACSIMILE
(201) 678-6267

WRITER'S EMAIL ADDRESS
dkohane@coleschotz.com

February 18, 2005

**BY FACSIMILE (516-873-2010)**

Lee J. Mendelson, Esq.
Moritt Hock Hamroff & Horowitz LLP
400 Garden City Plaza
Garden City, New York 11530

Re: Campinas Foundation v. Carl Simoni, et al.
Docket No. 02 CV 3965

Dear Mr. Mendelson:

We received your February 10 letter by mail on February 14.

Substantively, your letter contains several errors. You are wrong that we served no objections. After several unsuccessful efforts by this firm to work out issues relating to your obviously overbroad subpoenas, we served objections on December 10, 2003. Although you claimed those objections were untimely, I disagreed in a letter I faxed you on December 18, 2003. I have enclosed copies of both of these letters. You did not respond and made no follow up effort on these subpoenas for 14 months.

You are also wrong that Judge Fox's November 18, 2004 Memorandum and Order disposed of all privilege objections to your subpoenas. The subpoenas were not even before the Court. The November 18 opinion ruled that Campinas had not proven it had a common litigation interest with Lensi or Eckes. It did not address whether AIIG or the AIIG affiliates we represented had a common interest with AIIG's shareholder, Blackbird, in the New Jersey and New York state lawsuits we were handling. In fact, your clients not only counterclaimed against our clients in AIIG's New Jersey case, they filed a third-party complaint against Blackbird and another AIIG affiliate we represented, Aviation Investors

International, Inc., and filed a separate action against our clients and Blackbird, in New Jersey. As you know, Lowenstein Sandler represented Blackbird in those New Jersey cases.

The November 18 opinion also did not rule on whether Jerry Rosen, who served both as managing agent and counsel to our clients, was outside the attorney-client privilege. The opinion also said nothing about the other objections in our December 10, 2003, letter. It could not have addressed those objections, since the subpoenas were not before the court.

You mailed your demand on February 10 without providing us the common professional courtesy of a telephone call to find out our availability, after more than a year of inaction, and demanded that we cull through thousands of pages of documents and make a production eight days after receiving your letter. Given the breadth of the subpoena, the "demanded" timeframe is unreasonable. In any event, Mike Meisel and I are both out of town the week of February 21, and on March 3 and 4 as well.

We are prepared to produce responsive, non-privileged documents and reschedule Mr. Meisel's deposition on Friday, March 11, 2005. The appearance should be at our New Jersey offices, where Mr. Meisel, who is just a witness in this matter, works. New Jersey is also more convenient for Mr. Wild and me.

Finally, I understand you have issued a subpoena to Jerry Rosen in which you call for his deposition on March 3 and for a document production similar to the production requested of us. Because that production and the deposition potentially implicates our client's privileged communications, we will have to review any documents Mr. Rosen proposes to produce for privilege and will need to be present at his deposition. As noted, Mr. Meisel cannot be present on March 3. If you believe you can accomplish Mr. Meisel's and Mr. Rosen's depositions on the same day, we suggest that Mr. Rosen's deposition also be scheduled for March 11.

Very truly yours,

David M. Kohane

cc: Jeffrey Wild, Esq.
Jerrold Rosen, Esq.